January 9th, 1906.

———————o———————

No. 3790.

Court of Appeal, Parish of Orleans.

B. SCANLAN, vs. THE NEW ORLEANS RAILWAYS CO.

Issues of fact only are involved herein.

Appeal from Civil District Court, Division "D."

Henriques & Duchamp, for Plaintiff and Appellant.

Harry H. Hall, for Defendant and Appellee.

MOORE, J. Plaintiff sued the defendant for damages arising from injuries inflicted upon two of his mules by a car of the defendant company.

The petition alleges that the accident occurred whilst plaintiff's float, to which was hitched a team of three mules, was crossing from one side of North Peters steet, and across the double line of car tracks, to the other side of the street so as to take the car track on that side; that the driver before proceeding to cross the street had satisfied himself that no car was coming towards him in either direction, he being in a position from his seat upon the float at that time to take a clear, unobstructed look of North Peters street for more than 150 yards in both directions; that the

123

said driver crossed the up-town track without mishap and had already swung his team around to enter the down-town track when the car bound down-town, struck his right pole, and lead mule, permanently injuring the latter, that the said car at the time of the collision was running at an unusual and extraordinary and dangerous rate of speed, that no attempt was made to stop the car until after same had struck the mules; that no gong was sounded and that at the time of the accident the motorman had his back turned and was engaged in conversation with some one on the car, presumably, the conductor.

The answer tenders the general issue with the averment that the accident was caused by the contributory negligence of the driver of plaintiff's float.

There was judgment for defendant and plaintiff appeals.

The place where the accident occured is on North Peters street, between Bienville and Conti streets, and at about 75 feet from the latter street and about 225 feet from the former. There is a double line of car tracks on North Peters street; the one on the river side being for the cars operated by the defendant company going down town, cars going up town using the track on the wood side. On either side of the tracks are paved streets. Cars going down North Peters street turn into that street from Canal street and from the point where they turn off from Canal street a clear and unobstructed view of their approach is offered all the way to Conti street, a distance of three blocks, or about 900 feet.

On the occasion of the accident, the plaintiff's float, hauled by what is known as a "spike" team, that is, a team of 3 mules, two of which are harnessed to the pole of the float and one hitched forward and proceeding them, and known as the "lead," had loaded at a point on the wood side of North Peters street at a point about 75 feet from Conti street, the mules being headed down town, or towards Conti street; float and mules being clear of both line of tracks.

When the float was loaded, the driver mounted the float and without turning around or looking in the direction towards Canal street, swung his team of mules around to the right, bringing the

124

lead mule from the wood side of the street, on which the float and mules were before they were put in motion, thence across the first line of tracks and on to the further, or down town track, and thence over to the river side of the street. This brought the two pole mules immediately on the down town track, and the float partly on this track and partly on the wood side of the street.

Whilst in this position the defendant's car, which was on its down town trip, ran over the leg of the right pole mule, crippling it to such an extent that the mule had to be killed, and slightly injuring the lead mule.

This much we gather from plaintiff's witnesses, two in number, who with the plaintiff himself testified that they were eye-witnesses to the accident.

One of them happened to be looking from the inside through a window of the establishment where the plaintiff's float was receiving its load, "watching the float pulling out." From his window, however, his attention was turned to a car coming down "at an unusual rate of speed," the speed being so great, faster than he had ever seen a car go down that street before, that it caused him to observe it.

From his position he said he could see only to the corner of Bienville street 225 feet away from him, and it was *there* he first observed the car, and then noticed that the motorman had his face towards the inside of the car apparently talking to some one; that it at once "struck me (him) that the car was going to hit the float, which it did, and it hit with such force that the car bounced back, and when the car bounced back, it looked like the motorman got confused; and the car came again and the driver of the float swung his leader around, trying to get the mules on the track, and the car came again and rolled over the mule's leg." He says that when the car got within 50 feet of the float the motorman then turned and looked ahead, "but it was too late *because the car was coming at such a rate of speed that he could not stop it,"* that no brakes were put on and that when the car bounced back, the motorman, "thinking he was backing the car, put on speed again and the car came along and hit the mules."

125

On cross examination, however, he says that the car did "not strike the float at all" but that it struck the mules and "with such force that the car bounced back, and it came up again and hit the mules again;" and, singular to relate, he says not only were the mules not thrown any distance at all, but simply "fell where they were and the car jumped back," but that the "driver *got them* (the mules) *up again* and tried to swing his mules around .again, and as he did so, the car came again and hit the mule which was shot afterwards, ran over his leg." It would tax the credulity of the feeblest mind to give credence to such a statement. We can readily appreciate the statement of the motorman, when testifying in the case, to the effect that even at the speed at which his car was going,—five notches, or half speed—had he struck the mules with that speed on, the impact would have been so great as not only to have "smashed the dashboard of his car to pieces," which it did not, but the car would have "dragged the mules to the corner" before he could have stopped it. Yet, withal, we are asked to believe that at the extraodinary high speed at which plaintiff's witnesses say the car was going, the brakes not put on, the current not reversed and the overhead not thrown off, the mules were simply thrown off their feet, and were at once pulled up again, and that the car on a rebound from the impact with the mules, inflicted the injuries complained of.

This improbable story is substantially corroborated by the plaintiff and the other witness who testified in his behalf. The plaintiff testifying on his own behalf says that as he was coming out Bienville street two negroes standing at the corner said to him "look!" then he turned and saw the car, then at that corner and 225 feet from the spot where the accident occurred, going at an unusual speed. He says that when the negroes called his attention to the car, he "looked around quick and saw the car at Bienville street," and added, "I looked down and saw my float coming across the track and I seen the car hit the mules and throw the three of them down." What time elapsed between his looking around from the corner of Bienville and North Peters streets and his seeing the car "hit the mules and throw the three of them down" is not stated by him. At any rate, when he did

see the mules hit he ran back to where they were, *and when he got there,* a distance of 225 feet for him to run, he saw the car "had started a *second time* and hit the mules again."

Of course this witness also noticed, when he saw the car at the corner of Bienville street, that the motorman "was looking back, like he was talking to. some one in the car, or doing something;" and, like, the previous witness, he heard no gong sounded.

The third witness was in a wagon near by plaintiff's float, but his wagon was headed towards Bienville street. He says that plaintiff's driver, although his team was headed in the opposite direction *pulled around him,* the witness, apparently intending to go up-town, and as he did so he went on the track of the down town car and the car struck the mules. He also says that the motorman was looking back and that he only looked forward when the car hit the mules. This witness also says that the car was going at a great speed and he fixes it at the rate of 3 or 4 miles faster than the regular cars run on that street. He admits, however, that he only noticed the motorman for the first time when the latter was at a distance of about 20 or 25 feet distance away from the collision," and that the motorman did have one hand on the controller and the other one on the brake. This witness also says that when the car hit the mules it bounced backward and then came forward again, but that it did not touch the mules at the rebound. It simply "knocked the mule off his feet at the first impact and the mule fell right down where he was." The driver of the float did not testify, notwithstanding there was a stipulation in the record to the effect that his testimony might be taken even after the case was closed, and out of Court.

On behalf of the defendant, all the passengers who were on the car when the accident occurred testified that the car was going at a slow rate of speed from the moment it turned out Canal street into North Peters street; that the gong was constantly sounded; that the motorman at no time turned towards the inside of the car; did not talk to or look towards any of the passengers or the conductor, and, if any sudden impact or collision, of the character and of the effect testified to by the plain-

tiff's witnesses, had occurred and which, if it happened, must have, of necessity, occassioned some considerable commotion among, and jolting of, the passengers, especially as they were all female passengers, none of them testify that any such commotion or jolting occurred, but, on the contrary, and as testified by one of them they did not know if anything was struck, only they said that a mule got hurt." The only commotion, if it may be so called, among the passengers was that of an old lady who became nervous at the constant sounding of the gong.

The testimony of these ladies is corroborated by the motorman and the conductor.

As testified by the motorman he was running on five notches or half speed; that seeing his track clear and the particlar float in question standing off on the wood side of the street with the mules headed towards Conti street he had no reason to believe that the driver of the float would suddenly swing his mules around and endeavor to cross both tracks; that suddenly when within 25 feet of the float the driver with his back towards the car turned his team right in front of the car, whereupon the motorman at once reversed the car and threw off the overhead and the car went back just in time to prevent it from hitting the mules hard. That the accident happend just in this manner we have no doubt, and that the motorman did all that it was possible for him to do under the circumstances is satisfactorily established. The motorman upon the car had no reason to anticipate that the plaintiff's team would attempt to cross the street under the existing conditions; while the plaintiff's driver knew perfectly well that the moving car was bound on its regular trip up to a point from that street on a fixed line, and must therefore, inevitably cross the path he was taken as he moved across. A motorman upon a moving car car may well have his doubts as whether to the driver of a wagon might intend to cross his track or not, but the driver of the wagon cannot but know that the purpose of the motorman is to carry his car along the track to its destination, unless there be some reasonable grounds for stopping or slacking his speed. Snyder, vs. Railroad 48 A. 12. Here there was no reasonable ground for the motorman to either stop his car or for slacking its speed. All indications pointed to the fact that the

team when it would start would go in the directon in which it was headed, to-wit, straight down the street and in the same direction in which the car was going. Indeed this is the direction which the plaintiff and one of the witnesses testify the driver intended to go, but they say that to do this the driver intended to get into the down town track.

He had plenty of room to go on from where he was and whether he intended to go up or down, he had no right to cross either track in the face of an approaching car which had the right of way on the track, and still less to do so suddenly and without looking in the direction from which he knew the car must come and when the car was so near that it could not possibly be stopped in time to avert injury. Our esteemed brother of the District Court correctly appreciated the evidence and applied the law and, therefore, the Judgment appealed from is affirmed.

Affirmed.